UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JEANNE ARMSTRONG,

    Plaintiff,

v.                                                                                                                4:04cv47-WS

ADVOCACY CENTER FOR PERSONS
WITH DISABILITIES, INC.,

    Defendant.

_____

<u>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

    The plaintiff, Jeanne Armstrong ("Armstrong"), filed this action on February 17, 2004, alleging that her employer, the Advocacy Center for Persons with Disability, Inc. ("the Center"), engaged in unlawful disability discrimination, gender discrimination, and retaliation. On April 4, 2005, the parties filed a stipulation of dismissal of all claims except Armstrong's claim that she was the victim of sexual harassment.

    Before the court at this time is the defendant's motion for summary judgment (doc. 28). The plaintiff has responded (doc. 46) in opposition thereto, and the parties have been advised (doc. 54) that the motion would be taken under advisement as of a date certain.

I.

    A wheel-chair-bound paraplegic, Armstrong alleged in a single sentence, in a count entitled "Gender Discrimination," that she was "the victim of sexual

harassment." Compl. at ¶ 25. She alleged no facts to support this claim of sexual harassment. In its motion for summary judgment, the Center first contends that Armstrong failed to properly plead a claim for sexual harassment. The Center then argues that Armstrong's sexual harassment claim has no merit. In support of its lack-of-merit argument, the Center has submitted affidavits, answers to interrogatories, deposition excerpts, and other documents that--according to the Center--demonstrate that Armstrong is not entitled to relief. The Center's submissions reveal the following:

In her charge of discrimination received by the Florida Commission on Human Relations on December 10, 2002, Armstrong alleged that she "endure[d] a sexually hostile working environment...under her prior supervisor." Doc. 31, Ex. 9. The "prior supervisor" to whom she referred was Steve Howells ("Howells"), Director of the Center's Protection and Advocacy of Individual Rights ("PAIR") program at all times relevant to this case. Armstrong did not allege when or how long she endured the hostile working environment, nor did she describe what her prior supervisor did to create such an environment.

In her answers to the Center's interrogatories, Armstrong stated that (1) from 1998 to 2001, Howells sometimes addressed her as "honey," "sweetheart," and "baby;" and (2) during the same time period, Howells sometimes touched her shoulders, caressed her back, gave her back rubs, hugged her, and asked her to smell his cologne. Armstrong stated that she verbally complained to Ellen Piekalkiewics (the Center's human resources supervisor) about these actions of Howells.

During her deposition, Armstrong was asked to describe the incidents of sexual

harassment that she endured. Armstrong responded that Howells--a blind, Caucasian male--called her "honey" "a lot," called her "sweetheart" on "numerous occasions," and called her "baby" once. Armstrong Dep. at 42-43. After admitting that she sometimes complimented Howells on the cologne(s) he wore, Armstrong said that Howells came up to her six or eight, maybe ten, times throughout the course of 2001, leaned over her, put his neck up to her nose, and asked if she liked the cologne he was wearing. Id. at 43-44.

Armstrong also said that, in or about January of 1999, when she learned that her 15-year-old daughter was pregnant, she went to Howells in tears, confiding to him the reason for her anguish. In the presence of Mike Fritch, who was in Howells' office at the time, Howells consoled Armstrong by patting her on the shoulder, "maybe rubbing up and down on [her] shoulder," and then hugging her. Id. at 45-48. Armstrong explained that the incident ended when she asked Howells for a tissue. Armstrong said she later verbally shared with Gary Blumenthal ("Blumenthal"), then Executive Director of the Center, that Howells was "too huggy." Id. at 53.

Armstrong said that, in the summer of 1999, she and Howells traveled by car to South Florida to conduct several site reviews. On one trip, after they checked into separate rooms at a hotel in Hollywood Beach, Howells knocked on Armstrong's door with a six-pack of beer in hand. Armstrong invited Howells into her room, and he started talking about his affairs with various women, including a Greek girl with large breasts and a gymnast who--in his fantasies--would do a cartwheel and land on his erection. When her phone rang, Armstrong asked Howells to leave her room. The next

day, as they were driving in the Florida Keys on their way to Key West, Armstrong described the scenery for Howells, commenting, in particular, about the beautiful bougainvillea plants. Howells started calling the plants "booby trees." Id. at 79. He also told Armstrong that he could imagine her having "hot, tropical sex." Id.

On the same or another trip to Key West, as Howells was pushing Armstrong in her wheelchair through Mallory Square, listening to Armstrong relay the joy she was feeling in being once again in Key West, Howells leaned down and hugged her around the upper shoulders. Uncomfortable with the hug, Armstrong wheeled her chair forward, and "that ended that." Id. at 82. When asked whether she ever discussed the trip incidents with anyone at the Center, Armstrong replied that she could not remember.

After Armstrong finished describing the above events at her deposition, counsel for the Center asked her: "Are there any other incidents, comments, occurrences, anything that you can think of, of a sexual nature with regard to Steve Howells?" Id. at 85. Armstrong answered: "At this particular moment, I am going to say no, but I reserve the right if I think of something to bring it up." Id.

According to several of her co-workers, Armstrong herself engaged in sexual banter in the workplace. Javacia Williams and Dawn Williams both stated in affidavits that they once received an e-mail from Armstrong that contained a picture of what appeared to be a "bouquet" of penises. Doc. 31, Exs. 5 & 6. They also stated that the Center's Executive Director was offended by the e-mail and directed all employees to delete the "bouquet" from their computers. Id. Dawn Williams and Ann Robinson stated

in affidavits that, on a number of occasions, Armstrong proudly referred to herself as having "tits of steel." Id. at Exs. 6 & 7. Ann Robinson stated that Armstrong jokingly volunteered to her that "rough sex" caused her (Armstrong) to have a pressure sore on her bottom. Id. at Ex. 7.

According to Blumenthal, Armstrong was one of many employees who complained to him about Howells, although only two, Armstrong and Sherry Smith, suggested that Howells had discriminated against them based on their gender. Specifically, Armstrong complained to Blumenthal about

> the way she was treated, the language that was used. Stern, very stern language. The lack of respect, a sense of belittlement, a sense that she could do no right. The sense that--that--a sense of being made to feel stupid.

Blumenthal's Dep. at 19-20. Blumenthal admitted that he himself had a problem communicating with Howells, who--in Blumenthal's words--was sometimes "defiant, rude, [and] insulting" to him. Id. at 27. As to Armstrong, Blumenthal investigated the situation but was unable to conclude "that her allegations with regard to [Howells] were completely accurate." Id. at 24.

In response to Armstrong's complaints about Howells, Blumenthal repeatedly counseled Howells, placed a written notation in Howells' personnel folder, required him to attend special training above and beyond the normal management course provided to the Center's supervisors, made improvement of his relationship with staff a part of Howells' performance plan, and generally tried to arrive at a peaceful resolution to the rancorous relationship between Howells and Armstrong. Id. at 20-25. In the fall of

2002, based not only on the many complaints voiced by Armstrong about Howells' mean-spirited and belittling behavior but also on the complaints--maybe five in number-- voiced by Howells about Armstrong's case work, Blumenthal finally concluded that the relationship between Howells and Armstrong was "too poisoned" to continue. Id. at 25. He then offered Armstrong the opportunity to work under another supervisor, Aleisa McKinlay, in the Center's Protection and Advocacy of Individuals with Mental Illness ("PAIMI") program. Armstrong agreed to make the change.

As Blumenthal said during his deposition, Armstrong was far from the only staff member who complained about Howells. When asked about Howells at her deposition, Joanne Burgess ("Burgess") said:

> What I really didn't like about working for [Howells] was he was so critical. He was critical of everybody. Nobody really measured up in his estimation....There were very few that didn't get some kind of criticism about the work they did, their motivation, their whatever, concerning their work.

Burgess Dep. at 8-9. Burgess explained that, after working under Howells (who was and is her neighbor) for a number of months in 1994, she left that job to take another (also with the Center) because she did not like the "negative environment" created by Howells and because Howells "made it pretty obvious that he had begun not to like me." Id. at 7-13. Burgess did not believe that her problems with Howells were attributable to her gender. Indeed, she said that if Howells criticized females more than males, it was only because there were more females in the office. Id. at 9.

Suzanne Hanisee ("Hanisee") described Howells as follows: "He's a very hard person to work for....He's very controlling. He's very manipulative. He's backstabbing,

insincere." Hanisee Dep. at 13.  Hanisee explained that she and Howells generally did not see eye-to-eye on most things and that she had tried to have as little contact with him as possible over the last four or five years.  Hanissee remembered hearing Howells call at least two female employees, "fucking bitches."  She said he called male employees, "fucking assholes."  Id. at 22-24.

Ellen Peikalkiewicz testified that Sandy Evans and Rick Jimenez reported to her that they had problems with Howells.  She remembered that Armstrong and Howells came to her about a dispute regarding Armstrong's attendance, but she did not remember that Armstrong ever complained to her about "inappropriate conduct" on the part of Howells.

Corey Hines ("Hines"), a male employee who was supervised by Howells even though he worked for the PAIR program in South Florida, explained during his deposition that every employee who worked with Howells had a problem with him at times.  Hines Dep. at 23-24.  In Hines's words, Howells was "a great supervisor" but "his communication style was difficult to deal with."  Id. at 25.  Hines said that Howells treated employees "badly" and was "aggressive," but he did not believe that Howells singled women out for such treatment.  Id. at 23-24.

II.

In response to the Center's motion for summary judgment, Armstrong has filed a number of deposition excerpts, all of which reveal that Howells was overly critical of everyone with whom he worked, that he was disliked by many, that he was verbally abusive, harsh, and controlling, that his belittling treatment of employees reduced many

to tears, and that his unpleasant management style was the subject of much grumbling among employees.  In her own affidavit, amongst conclusory assertions and rank hearsay, Armstrong stated that Howells was critical, rude, arrogant, and accusatory, that he demoralized, demeaned, and discredited her in front of her coworkers, that he made false accusations against her, that he made her feel like "an inferior species," and that he assigned her abusive case loads.  She also stated that Howells sometimes used terms of endearment to address her, that he sometimes spoke about his wife's "fat ass" and "fat tits," that he occasionally put his neck close to her so she could smell his cologne, and that he sometimes gave her backrubs.  She stated that she verbally complained about Howells on frequent occasions, both to the Executive Director and to the Human Resources Supervisor.  While most of her complaints concerned Howells's demeaning and belittling treatment of her work, she at least once complained that Howells was "too touchy feely."  She did not state that she otherwise complained about unwelcome sexual advances, conduct of a sexual nature, or offensive remarks or jokes relating to sex.

III.

Armstrong claims that she was the victim of sexual harassment.  The Supreme Court has recognized two types of sexual harassment cases: (1) harassment that culminates in a "tangible employment action," such as discharge, demotion or undesirable assignment; and (2) harassment in which no adverse "tangible employment action" is taken but which is sufficient to constructively alter an employee's working conditions.  Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761-63, 118 S. Ct. 2257,

141 L. Ed. 2d 633 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d. 662 (1998).  When a supervisor engages in sexual harassment of the first type, an employer is automatically held vicariously liable for the harassment. Ellerth, 524 U.S. at 763; Faragher, 524 US. at 790.  When a supervisor's harassment involves no adverse employment action, an employer can avoid vicarious liability for the supervisor's conduct by establishing that (1) "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior;" and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  Faragher, 524 U.S. at 807 (cite omitted); Ellerth, 524 U.S. at 765 (cite omitted).  In this case, Armstrong complains of the second form of sexual harassment, harassment in which no adverse "tangible employment action" has been taken.

In Mendoza v. Borden, Inc., 195 F.3d 1238 (11th Cir. 1999) (en banc), the Eleventh Circuit set out the elements that an employee must prove to succeed with a sexual harassment claim of the no-tangible-employment-action type.  Specifically, an employee must establish:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

Mendoza, 195 F.3d at 1245.  In Gupta v. Florida Bd. of Regents, 212 F.3d at 583, the

court emphasized that the challenged conduct "must be of a sexual or gender-related nature." Boorish behavior is not enough to establish a hostile environment; there must be "sexual advances, requests for sexual favors, [or] conduct of a sexual [or gender-related] nature." Id. (quoting Mendoza, 195 F.3d at 1245). As the Seventh Circuit noted in Minor v. Ivy Tech State College, 174 F.3d 855 (7th Cir. 1999):

> [S]exual harassment that does not involve a supervisor's extorting sexual favors, that instead involves the creation of a hostile work environment, must be..."extreme." It is not enough that a supervisor or coworker fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor. Such failures are too commonplace in today's America, regardless of the sex of the employee, to be classified as discriminatory.

Minor, 174 F.3d at 857-58 (internal citations omitted).

### IV.

In this case, Armstrong complains about a supervisor who is, among other things, arrogant, rude, demeaning, and controlling. The evidence reveals that such complaints are shared by almost everyone with whom that supervisor has worked, males and females alike, those above him as well as those below him in the Center's employment hierarchy. These complaints do not support Armstrong's claim of sexual harassment.

Armstrong also complains about the supervisor's use of endearments, about his occasional--albeit offensive--comments about his wife's breasts and bottom, about the hugs he gave her in 1999 (once when she was crying in his office and once while he was pushing her in her wheel chair in Key West), about his coming to her hotel room

with a six-pack of beer (he left when she asked him to leave), and about his occasional sexual banter (calling bougainvillea bushes "booby" trees, describing his affairs and fantasies about women, telling her he could imagine her having "hot, tropical sex," all during a 1999 business trip to Key West).  While this conduct is inappropriate, even offensive, it does not equal severe or pervasive sexual harassment.

Armstrong says, and the record reveals, that she complained about the treatment she received from Howells to various people on many occasions.  She says that she complained verbally--at a time when the Center's sexual harassment policy[1] clearly required a written complaint--to the Executive Director that Howells was "too huggy."  Her other complaints, however, concerned Howells' response to her work; they did not concern sexual threats, sexual banter, sexual advances, or anything else that might arguably be considered "sexual" in nature.

While acknowledging that Armstrong indeed complained about Howells on many occasions, the Center maintains that it is not liable for Howells' alleged harassment because (a) the Center had a sexual harassment policy in place; (b) Armstrong received a copy of the policy and was aware of its provisions; and (c) Armstrong never alerted the Center, either in writing or verbally, that Howells was engaging in conduct that

---

[1] The Center's sexual harassment policy, effective in July 2002, provided that "[i]f an employee believes he/she has been treated in violation of [the sexual harassment policy], he/she should immediately report the alleged act to his /her supervisor.  If the employee prefers not to make the report to the supervisor, the offensive behavior should be reported directly to the Executive Director or the Deputy Director of Operation."  Before 2002, any employee who believed he/she was a victim of sexual harassment was required to file a written complaint.  Armstrong admits that she received a copy of, and was aware of, the Center's sexual harassment policy.

amounted to sexual harassment.  Both Executive Director Blumenthal and Human Resource Supervisor Piekalkiewics stated that, while Armstrong complained about Howells, her complaints did not concern "inappropriate behavior" that might constitute sexual harassment.  Armstrong's vague and self-serving suggestions to the contrary are insufficient to raise a genuine issue of material fact in this regard.

The Center further argues that, even *if* Armstrong's complaints can be construed to be complaints of sexual harassment, the Center's Executive Director took many steps to correct the situation, including, but not limited to: repeatedly counseling Howells, placing a written notation in Howells' personnel folder, requiring him to attend special training above and beyond the normal management course provided to the Center's supervisors, making improvement of his relationship with staff a part of Howells' performance plan, and ultimately offering Armstrong a move to another position where she would not be supervised by Howells.  The Center contends that, given the nature of Armstrong's complaints and the many steps the Center took in response to Armstrong's complaints, the Center has established an Ellerth/Faragher defense to liability.  The court agrees.

V.

In sum, because Armstrong has failed (1) to properly plead a claim for sexual harassment, (2) to raise--even if it is *assumed* that her pleading is adequate--a genuine issue of material fact regarding her sexual harassment claim, and (3) to demonstrate that the Center's Faragher/Ellerth defense is without merit, it is ORDERED:

1.  The Center's motion for summary judgment (doc. 28) is GRANTED.

Case No. 4:04cv47-WS

2.  The clerk shall enter judgment in favor of the Center and against Armstrong accordingly.

3.  Costs shall be taxed by the Clerk of the Court against Armstrong.

DONE AND ORDERED this July 22, 2005.

                    /s William Stafford  
                    WILLIAM STAFFORD  
                    SENIOR UNITED STATES DISTRICT JUDGE